# UNITED STATES DISTRICT COURT

for the

District of Alaska

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**ISRAEL KEYES** | )<br>)<br>)<br>)<br>)<br>)    Case No. 3:12-mj-00153 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____**ALASKA**_____ , there is now concealed *(identify the person or describe the property to be seized)*:
**DNA of Israel Keyes**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1201 | Kidnaping |
| 18 U.S.C. 2119 | Carjacking |
| 18 U.S.C. 1202(b), 1029(a)(5) | Ransom Money, Access Device Fraud |

The application is based on these facts:

**SEE ATTACHED AFFIDAVIT of S/A Jolene GOEDEN**

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**/s/ Signature Redacted**

*Applicant's signature*

Jolene Goeden, S/A, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: _April 11, 2012_

City and state: _Anchorage, Ak._

**/s/John D. Roberts, USMJ**
Signature Redacted

*Judge's signature*

Magistrate Judge John D. Roberts

*Printed name and title*

## UNITED STATES DISTRICT COURT
## THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF )      Case No. 3:12-MJ-00153-JDR
THE PERSON OF ISRAEL KEYES FOR )
BUCCAL SWABS )
        **Filed under seal**
)
)

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jolene Goeden, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I am a Special Agent of the Federal Bureau of Investigation (FBI). I have been a Special Agent of the FBI since April 2004. I am charged with the duty of investigating violations of the laws of the United States, collecting evidence in cases in which the United States is or may be a party in interest, and performing other duties imposed by law. I have been assigned to investigate most criminal matters within the jurisdiction of the FBI, including kidnaping matters, fraud matters and other white collar crime.

2.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to seize DNA buccal swabs from Israel KEYES. The items to be seized are described in Attachment A.

3.       I believe that there is probable cause that evidence of the following federal crimes will result from the seizure and search of these items: Title 18, United States Code (USC), Section 1029(a)(5) (Fraud and Related Activity in Connection with Access Devices )(FRACAD); Title 18, United States Code, Section 1201 (Kidnapping); Title 18 , United States Code, Section

1

2119 (Carjacking); and Title 18, United States Code, Section 1202(b) (Ransom Money). The evidence to be collected from these seizures are described in Attachment B.

## RELEVANT STATUTES

4.     There is probable cause to believe that the hair and buccal swabs contain evidence of and is an instrumentality used for violations of Title 18, USC, Section 1029(a)(5), Fraud and Related Activity in Connection with Access Devices, which provides that:

> Whoever, knowingly and with intent to defraud effects transactions with 1 or more access devices issued to another person or persons, to receive payment or any other things of value during any 1-year period that aggregate value of which is equal to or greater than $1,000;

and Title 18, United States Code, Section 1201 (Kidnaping), which provides that:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;

and Title 18, United States Code, Section 1202(b) (Ransom Money), which provides that:.

> Whoever receives, possesses, or disposes of any money or other property, or any portion thereof, which has at any time been delivered as ransom or reward in connection with a violation of section 1201 of this title, knowing the same to be money or property which has been at any time delivered as such ransom or reward;

and Title 18, United States Code, Section 2119 (Carjacking), which provides that:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped or received in interstate or foreign commerce from the presence of the person or presence of another by force and violence or by intimidation, or attempts to do so.

## IDENTIFICATION OF THE ITEMS SEIZED

5.     The property to be seized is identified in Attachment A. Agents would go to the

2

Anchorage Correctional Complex where KEYES is currently housed to collect the samples. Agents would collect two buccal swabs from KEYES. Buccal swabs are seized by the gentle rubbing of the buccal cavity (which is the oral cavity formed by the teeth and gums and the interior of the cheeks and lips) with two dry, sterile cotton-tipped swabs. Consecutive swabs are used, one after the other to obtain an adequate sample for testing.

6.      The applied for warrant would authorize the extraction of DNA evidence that may be used to possibly link ISRAEL KEYES to the crimes set forth above.

## PROBABLE CAUSE

7.      The information contained below is from my personal knowledge and experience, information provided to me by other law enforcement personnel, or from those specific sources as set forth. Since this affidavit is being submitted for the limited purpose of seeking DNA samples, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish a foundation to support the aforementioned request for a search warrant.

## Abduction of Samantha Koenig ("S.K.")

8.      On 2-2-12 at about 12:39 Alaska Standard Time (AST), Duncan, the owner of the Common Ground Coffee stand at 630 E. Tudor, Anchorage, Alaska, contacted APD dispatch. Duncan was calling from Oregon, where he was vacationing. He reported that while viewing his internet-based security system he saw one of his employees, 18-year-old S.K., appear to be abducted. Duncan said he was contacted by S.K.'s father (J.K.) and boyfriend (D.T.), who had been unable to locate her. This contact prompted Duncan to review his security

3

video which showed an unknown man climb through the window of the coffee stand at about

20:00 AST on 2-1-12 while S.K. was working. The video appears to show S.K. retreating a short

distance and raising her hands in an apparent sign of submission to the man who subsequently

climbed into the coffee stand, robbed S.K. and escorted her away from the scene. The abductor

climbed through the window into the coffee stand without any significant difficulty. He

appeared to be significantly taller than S.K., who is 5'4" tall, but due to the limited lighting and

quality of the video, a more accurate estimate of his height has not been made. The

robber/abductor appeared to have a medium to large build and athletic movements.

      9.    At the time of her abduction, S.K. was wearing a dark-colored jacket, a green

shirt with light-colored stripes on the sleeves, a thin dark-colored bracelet, dark-colored pants,

and dark-colored shoes. At the time of her abduction, S.K. was also believed to be in possession

of a carabineer with three keys and possibly a white lanyard, a medium-to-large size leopard

print purse, and a black cellular telephone with sliding keyboard. S.K. is a white female adult,

approximately 5'4" tall, 150 pounds, 18 years old, with shoulder-length brown hair and brown

eyes.

      10.    Video surveillance appeared to show S.K.'s robber/abductor wearing a dark-

colored, possibly hooded, jacket, dark-colored glasses, a dark-colored face mask, dark-colored

gloves, dark-colored pants; and dark-colored shoes. He appeared to be carrying a white coffee

cup and a dark-colored bag. Although to date no weapon has been conclusively identified in the

surveillance videos that captured this robbery/abduction, the scene was generally poorly lit and

the robber/abductor was not always fully visible. Furthermore, S.K.'s reaction appeared to be

consistent with someone who was confronted or threatened with a weapon. In addition, during

4

separate subsequent interviews, both S.K.'s father and boyfriend adamantly indicated that S.K. was very strong-willed and would not have complied with a robber or abductor's demands, unless she had been threatened with a weapon.

11.    Surveillance video from a nearby Home Depot at approximately 19:54 AST on 2-1-12 showed a white Chevrolet extended cab truck roll through the Home Depot parking lot and park just east of an International House of Pancakes. From a distance, the surveillance showed an individual with a black garment and hat get out of the truck and walk westbound through the parking lot towards Denali St., cross it, get on the sidewalk, walk southbound on Denali St. to Tudor Rd., cross Tudor Rd. at the intersection, and, finally, exit the frame. The individual's travel was in the direction of the Common Ground Coffee stand, from which S.K. was abducted. One minute later, the video surveillance footage from Common Ground Coffee stand showed the individual who abducted S.K. approach from the direction of the man in the Home Depot video. Approximately two minutes after S.K. and her abductor exited the frame of the Common Ground Coffee stand video footage, two persons appearing to match S.K. and her abductor again entered the frame of the Home Depot video footage, this time walking back towards the location where the white Chevrolet truck was originally parked. The Home Depot video then showed the two people approach the passenger side door of the Chevrolet truck. It then showed the person who appeared to be S.K. enter the passenger side of truck. The other individual then walked around truck, entered the driver's side, and drove out of the surveillance video's frame. As described below, police have now identified KEYES' residence and located a white Chevrolet truck registered to him at that residence. This white Chevrolet truck belonging to KEYES appears to match the vehicle in the Home Depot surveillance footage, although KEYES' truck

5

has several toolboxes and a ladder rack fastened with removable bolts to the truck bed, and these items do not appear on the truck in the Home Depot video.

12.     During an interview on 02-02-2012, D.T. (S.K.'s boyfriend) said he went to the coffee stand on 2-1-12 at about 20:33 AST to give her a ride home but the stand appeared to be closed and she was not there. D.T. further reported to law enforcement that on 02/02/2012, at approximately 03:00 AST, he observed an unknown male adult wearing a ski mask and dark clothing going through the vehicle he shared with S.K. D.T. did not alert authorities to the burglary of the vehicle at that time.

13.     When D.T. was asked where his ATM debit card was by APD Detectives several days after the abduction, he indicated he had left it in the vehicle he shared with S.K. This vehicle had been seized by APD on 02-02-2012 and searched pursuant to a State of Alaska search warrant. The debit card referenced above was not located during the search; however law enforcement did not notify D.T. of this fact. D.T. indicated that his debit card was a Credit Union 1 VISA debit card (VISA debit card) bearing XXXXXXXXXXXX2851, expiration 01/15, and that he did not give his VISA debit card to anyone else or give anyone permission to use it. The card is thus believed to have been stolen from D.T.'s vehicle at the time D.T. observed the vehicle break-in. D.T. further related that S.K.'s driver's license had also been in his vehicle. That driver's license was missing when searched for on 02-02-2012, indicating that it also was stolen at that time. I know that a driver's license is generally necessary to leave the State of Alaska by airplane, road or ferry, due to established interstate (or international in the case of travel to/from Alaska via the Alaska-Canada Highway) travel requirements. Furthermore, due to Alaska's unique geographic location, the difficulty of traveling by road

6

through northern Canada in winter, and the lengthy periods generally associated with traveling to/from Alaska by ferry, commercial airlines are the most common and popular mode of interstate travel to/from Alaska, especially during the winter.

### Ransom Note and Transfer of Funds to "Ransom Account"

14. On 02-24-2012, at 19:56 AST, D.T. received the following text on his cell phone 907-231-9835 from S.K.'s cell phone 907-884-8370 - "Conner park sign under pic of albert aint she purty". J.K. (S.K.'s father) contacted law enforcement officers and relayed the information. At the request of APD Detectives, at approximately 20:18 AST, APD Patrol Officers arrived at Conner Park located on the southeast corner of Jewel Lake Road and International Airport Road in Anchorage, Alaska. J.K.and D.T. were already present. Attached to the park sign, below a flyer for a lost dog named "Albert," was a ziploc bag which contained a folded piece of paper.

15. On one side of the piece of paper, there was a photograph of S.K. with silver duct tape around her mouth and chin. She appeared to be wearing eye liner, and a light-colored, latex-gloved hand and lightly complected, muscular arm was holding S.K.'s hair. In the upper part of the photo was an Anchorage Daily Newspaper determined to be the issue released on Monday, February 13, 2012.

16. On the reverse side of the piece of paper was a ransom note which demanded $30,000. The note included the 16-digit card number of the debit card belonging to D.T., which he had reported stolen on the night of the kidnaping, as summarized above. This debit card number is correlated to a bank account number held by D.T. and S.K. The note demanded that $30,000.00 be deposited into that account and indicated that the writer of the note intended to withdraw money at regular intervals over the coming days, and in locations other than Alaska.

7

Specifically, it said, "I may not use the card much in ak due to small pop but as I will be leaving soon I will be using it all over." The note further gave an indication that S.K. had been moved from Alaska, stating that "she did almost get away twice. once on tudor and once in the desert. must be losing my touch." I know from research, training, and experience, and discussions with law enforcement officers familiar with Alaska that there are no areas in Alaska commonly referred to and known to be "deserts." Many such areas do exist in Arizona, New Mexico and Texas. Subsequent analysis of the demand note by the FBI Laboratory revealed that it was typed with a typewriter that used a carbon ribbon, and that the aforementioned picture on the back of the demand note was printed with an inkjet printer.

17. On 02-29-2012, at approximately 16:55 AST, J.K. contacted APD Detectives and told them he was withdrawing $5,000.00 from the reward account set up for S.K. at Denali Alaskan Federal Credit Union, and he intended to deposit it in the ransom fund, which was an account held by Credit Union 1. Pursuant to a State search warrant obtained by APD Detective Joseph Barth on 02-25-2012, investigators were informed that $5,000.00 was deposited in the Credit Union 1 account indicated on the ransom note, (the account attached to the Credit Union 1 VISA debit card [VISA debit card] bearing XXXXXXXXXXXX2851, expiration 01/15 issued to D.T).at 17:45 AST on 02-29-2012).

### Unauthorized use of Credit Union 1 VISA debit card

18. On 02-29-2012 at 22:13 AST, an unknown person utilizing D.T.'s Credit Union 1 debit card attempted to withdraw $600.00 in US Currency from the account indicated on the ransom note. The attempted withdrawal took place at the Automatic Teller Machine (ATM) located at the Alaska USA bank at 4000 Credit Union Drive in Anchorage, Alaska. Because the

8

attempted amount was over the $500.00 daily limit, the withdrawal was declined. Surveillance video in the area of the ATM revealed a male dressed in a black hooded sweatshirt and black pants, operating a light-colored SUV, arrived in the parking lot of the Sea Galley restaurant across the street. After parking the SUV, the male exited and quickly walked across the street to the area of the Alaska USA ATM. The SUV was later determined by the FBI to be a silver Nissan Xterra of a model between the years 2005 and 2012. As noted below, police have now determined that KEYES' girlfriend owns a silver 2007 Nissan Xterra.

19.     On 02-29-2012 at 23:56 AST, $500.00 in US Currency was withdrawn from the ATM at the Denali Alaskan Federal Credit Union located at 3020 Minnesota Drive in Anchorage, Alaska. The debit card utilized to withdraw the money was the same Credit Union 1 debit card issued to D.T. Surveillance video obtained of the area revealed this withdrawal was conducted by an unknown male with a muscular appearance wearing a dark-colored, possibly hooded, jacket with a light-colored design or paint spatter on the left chest and front, and light-colored lettering, including possibly "CORPS" across the back shoulders; clear or light-colored glasses; a gray face mask; gray gloves; dark-colored pants; and light-colored shoes.

20.     During the course of the investigation, Detective Blanton and Officer Pierce of APD obtained surveillance footage from businesses surrounding the Alaska USA, which is located on Credit Union Drive in Anchorage, Alaska. Immediately before the withdrawal, a hidden surveillance camera located at the Sea Galley at 4101 Credit Union Drive in Anchorage, Alaska captured a similarly dressed male park in the extreme southwest corner of the Sea Galley parking lot driving a silver Nissan Xterra. From the surveillance video, the male appeared to exit the vehicle and walk westbound across the street to the Alaska USA and return a short while

9

later. Both the male's appearance and timing are commensurate with him being the person who attempted to withdraw the money.

21.     On 03-01-2012 at approximately 00:28 AST, $500.00 in US currency was withdrawn from the ATM at the Alaska USA located at 7701 Debarr Road in Anchorage, Alaska. As with the prior two transactions, the debit card utilized to withdraw the money was the Credit Union 1 debit card issued to D.T.

22.     On 03-07-2012 at approximately 21:57 AST, $400.00 in US currency was withdrawn from the ATM at the Western Bank located at 200 West Rex Allen Road in Willcox, Arizona. The debit card utilized to withdraw the money was the Credit Union 1 debit card issued to D.T. Surveillance video on the ATM showed the individual using the debit card for the withdrawal was a white male dressed in a gray hooded jacket or sweatshirt, glasses, a gray face mask, gray gloves, dark-colored pants, and light-colored shoes, and appeared to be driving a late model white Ford Focus sedan.

23.     On 03-07-2012 at approximately 23:24 AST, there was an attempted $400.00 withdrawal at the Western Bank located at 711 Main Street in Lordsburg, New Mexico, using D.T.'s Credit Union 1 debit card (the same card referenced in prior paragraphs.) The withdrawal was declined by the ATM as it would have put the debit card over the daily withdrawal limit. At 23:25 AST, at the same ATM, a balance inquiry was conducted on the account utilizing the debit card. The balance shown was $3,598.91. At 23:26 AST, $80.00 was withdrawn from the account utilizing the debit card. Surveillance video on the ATM showed the individual using the debit card wore similar clothing to the first ATM withdrawal in Arizona.

24.     On 3-9-2012 at approximately 23:23 AST, there was a $483.00 withdrawal made

10

at an ATM at Houston Community Bank, 1515 FM 1960 Bypass East, Humble City, Texas. Initial review of the surveillance video from the ATM appeared to show that the individual using the debit card wore similar clothing to that worn during the two aforementioned ATM withdrawals in Arizona and New Mexico.

25.    On 03-11-2012 at approximately 23:47 AST, there was a $480.00 withdrawal at the People's State Bank located at 5850 Hwy 59 South, Shepherd, Texas using D.T.'s Credit Union 1 debit card (the same card referenced in prior paragraphs.) Surveillance video on the ATM showed the individual using the debit card wore similar clothing to the first ATM withdrawal in Arizona, as well as the subsequent withdrawals in New Mexico and Texas.

### Stop of the White Ford Focus

26.    On 03/13/2012, at approximately 11:00 Central Time (CT), Texas Ranger Steven Rayburn, while in the company of FBI Agent Deborah Gannoway, was notified by Texas Department of Public Safety (DPS) Highway Patrol Corporal Bryan Henry (Corporal Henry) that a white Ford Focus sedan bearing Texas license plate DH4N930 was observed parked at the Quality Inn & Suites (QIS), 4306 South First Street, Lufkin, Texas, which is a short drive from Shepherd, Texas.

27.    On 03/13/2012, at approximately 11:15 CT, Ranger Rayburn and FBI Agent Deborah Gannoway responded to the QIS, at which time Agent Gannoway conducted a walk-by and visual inspection of the white Ford Focus. Agent Gannoway noted a bar-code sticker on the driver's side back passenger window consistent with stickers applied to rental vehicles. Agent Gannoway also noted numerous items of clothing, trash and other debris in plain sight within the vehicle, including what appeared to be a girl's or woman's pink item of clothing. Ranger

11

Rayburn caused a Texas license plate database search to be conducted which revealed the white 2012 Ford Focus was registered to PV Holding Corporation, 9603 John Saunders Road, San Antonio, Texas. DPS Criminal Investigative Division (CID) Lieutenant Mickey Hadnot (Lieutenant Hadnot) maintained surveillance on the Ford Focus.

28. On 03/13/2012, at approximately 11:30 CT, Lieutenant Hadnot reported to Ranger Rayburn, who was in the company of FBI Agent Deborah Gannoway, that a white male adult exited room 215 of the QIS, placed some items into the trunk of the aforementioned white Ford Focus, and departed the scene alone, driving the white Ford Focus. FBI Agent Gannoway had previously obtained from the QIS front desk manager an "in house list" of all occupants of the QIS on the night of 03/12/2012, which reflected room 215 was rented by ELIJAH KEYES for the time period 03/09/2012 through 03/13/2012.

29. On 03/13/2012, at approximately 11:45 CT, Corporal Henry conducted a traffic stop on the white Ford Focus sedan based in part on FBI Agent Gannoway's suspicion that the vehicle was the same vehicle used in the Arizona, New Mexico, and Texas ATM withdrawals, as well as Corporal Henry's assessment that the driver of the vehicle was traveling in excess of the posted speed limit. Upon FBI Agent Gannoway's arrival at the car stop location, Corporal Henry provided to FBI Agent Gannoway Alaska Driver's License number 7268639, in the name of ISRAEL KEYES, which KEYES had provided to Corporal Henry prior to Agent Gannoway's arrival at the scene. Corporal Henry told Agent Gannoway that KEYES informed him he flew from Anchorage, Alaska, to Las Vegas, Nevada, on 03/07/2012, and that he rented the white Ford Focus at the Las Vegas airport, driving to his present location over the course of the ensuing week. KEYES provided to Agent Gannoway a copy of his car rental agreement, which

12

corroborated his statement that he had rented the car at the Las Vegas, Nevada, airport on 03/07/2012. KEYES was unable to describe to Agent Gannoway the route he drove from Nevada to Texas, but stated he was in Lufkin, Texas, to attend his sister's wedding in Wells, Texas. KEYES told Agent Gannoway he "probably" paid for fuel throughout his travels from Nevada to Texas with cash. Ranger Rayburn reported to Agent Gannoway that there was a pair of large white tennis shoes partially pushed under the driver's seat of the Ford Focus, which Ranger Rayburn could plainly see through the window. During questioning by Agent Gannoway and Ranger Rayburn, KEYES became increasingly agitated and uncooperative, and he refused to allow Agent Gannoway and/or Ranger Rayburn to inspect his wallet (which was in his pocket) or his vehicle. KEYES became unusually nervous and began to sweat profusely, in spite of the slightly cool weather and the tank top which he was wearing at the time. KEYES expressed to Agent Gannoway that if he was going to be kept in the area for a longer period of time, he desired to call his brother (who has KEYES' daughter in a separate car) and notify him of same. Agent Gannoway suggested KEYES make that call. A short time later, the 2012 Ford Focus was transported to and secured at the Lufkin, Texas, Police Department.

30. Based on the aforementioned observations, including the fact that the rented Ford Focus matched the description of the vehicle utilized in the ATM withdrawals in Arizona, New Mexico and Texas, KEYES' arrival in Las Vegas, Nevada, and his subsequent travel from Nevada to Texas very likely resulting in KEYES traveling through Arizona on or about 03/07/2012 (the date of a $400.00 ATM withdrawal in Arizona) and New Mexico on or about 03/08/2012 (the date of an $80.00 ATM withdrawal in New Mexico), KEYES' appearance closely matching the description of the white male adult observed in videos of the above-

13

described ATM withdrawals, KEYES' own admission that he lived in the Anchorage, Alaska, area, KEYES' Alaska driver's license reflecting an Anchorage, Alaska, address, the white tennis shoes under the driver's seat matching the description of the shoes worn by the white male adult observed in the videos of the above-described ATM, as well as other observations, Agent Gannoway instructed Corporal Henry to place KEYES under arrest. Ranger Rayburn, in Agent Gannoway's presence, searched KEYES' wallet, revealing a VISA ATM/Debit card bearing account number XXXXXXXXXXXX2851, expiration date 01/15, in the name of D.T. This card is linked to the "ransom account" identified above, from which the withdrawals and attempted withdrawals summarized above were made.

### Discovery of KEYES' White Chevrolet Truck

31.     APD Detectives discovered that ISRAEL KEYES listed a mailing address of 3705 Arctic Blvd. #2891 in Anchorage, Alaska, on 07-18-2011, which is the Mail Cache. APD Detectives also discovered that KEYES listed a residential address of 2456 Spurr Lane in Anchorage, Alaska, as of 07-18-2011.

32.     On 03-13-2012 at approximately 10:30 AST, members of the APD Special Assignment Unit went to KEYES' home address at 2456 Spurr Lane in Anchorage, Alaska. No one answered repeated knocks on the door. Per APD Sergeant Redick, there were fresh tire impressions in the snow in the driveway of the address that appeared as if a vehicle had been parked there as recently as the morning of 03-13-2012.

33.     There was also a white Chevrolet pickup truck parked in the driveway of the address. The truck had a large toolbox in the bed and a ladder rack on top. The bolts securing those items were removable and appeared to have been recently added. The license plate on the

14

truck was Alaska license plate FTC990, relating to a white 2004 Chevrolet Silverado, registered to ISRAEL KEYES at 2456 Spurr Lane in Anchorage, Alaska. The white Chevrolet truck appeared to match the vehicle appearing in the Home Depot surveillance video, as summarized above. Further, Detectives eventually contacted KEYES' girlfriend and discovered that she drives a 2007 Nissan Xterra, which matched the general description of the vehicle used by an individual who appeared to attempt to use the stolen debit card on 2-29-12, as summarized above.

### Execution of Search Warrant on Ford Focus

34.     On March 16, 2012, law enforcement agents in Beaumont, Texas obtained a search warrant, which authorized the search of the white Ford Focus driven by KEYES. Execution of that search warrant on March 17, 2012 revealed numerous items, including a cellular phone believed to belong to S.K.

### Initial Interviews with Israel Keyes

35.  KEYES was transported to Anchorage, Alaska and arraigned on March 27, 2012 on one count of Access Device Fraud. He was provided defense counsel at government expense. Subsequently, KEYES agreed through counsel to be interviewed by law enforcement. On March 30, 2012, two interviews with KEYES took place. In the first interview, investigators presented KEYES with a selection of the evidence and investigative actions summarized above. KEYES then requested some time to speak alone with his attorney. Several hours later, KEYES agreed through counsel to be interviewed by law enforcement. In this second interview, KEYES stated that he had abducted S.K. on 2-1-12, and that she had been dead before he left for a vacation approximately ten hours after the abduction.   KEYES indicated that S.K.'s body could be found

15

in Matanuska Lake in Alaska, and identified the precise location at which he had dropped her remains through the ice. KEYES indicated that he raped S.K. before and after murdering her, and that he believed that law enforcement would find his DNA when they found her body. KEYES indicated that he had "lots more stories to tell," and stated that his ex-girlfriend knew nothing of his criminal activities, as he was "two different people." When asked how long he had been "two different people," KEYES immediately and specifically responded, "fourteen years."

36. On April 1, 2012, KEYES agreed through counsel to a third interview with law enforcement. In this third interview, KEYES explicitly stated that he murdered S.K., and gave substantial details about the murder. He further explained how he posed S.K.'s body to appear alive in order to take the ransom photograph noted above, and gave details about the location and manner of his disposal of S.K.'s body.

### Discovery of S.K.'s Body

37. On April 2, 2012, investigators discovered S.K.'s remains in Lake Matanuska, at the precise location identified by KEYES. SK's remains were transported to the State of Alaska Medical Examiner's office for a forensic exam and autopsy. During the course of this exam, trace evidence including hairs were removed from S.K.'s. Body.

### Fourth interview with KEYES

38. On April 6, 2012, KEYES agreed to a fourth interview, on the explicit terms that the S.K. case would not be discussed. KEYES indicated his willingness to share "other stories"

16

with investigators. In this interview, KEYES implied that he had murdered many persons over the past fourteen years, in many different locations. KEYES stated that he had many "cards to play," and didn't want to give them all away at once. He was asked to give the identity and location of just one body. After thinking silently for about twenty seconds, KEYES stated, "I'll give you two." He then confessed to the kidnapping, carjacking and murder of B.C. and L.C. near Burlington, Vermont in June 2011. After working with an electronic map for approximately thirty minutes, KEYES located the abandoned farmhouse in which he believed he had disposed of their remains. KEYES also indicated that he thought that his DNA might be recovered when they recovered the bodies.

39.     A quick records check verified that, indeed, Bill and Lorraine Currier, ages 49 and 55, had inexplicably gone missing on June 8, 2011. KEYES stated that, when he killed the Curriers, he was in Vermont en route to a vacation in Maine, technically visiting family. KEYES identified one hotel at which he stayed, and indicated that Bill and Lorraine Currier had lived in a house several blocks from this hotel; KEYES indicated he had chosen the Curriers randomly.

40.     Vermont investigators have been contacted and are working on attempting to corroborate KEYES' confession. Investigators contacted the hotel identified by KEYES and verified that he had indeed been a guest there during the relevant time period. However, the farmhouse where KEYES stated that he disposed of the bodies has been demolished. Investigators plan on excavating the area where the farmhouse stood this week.

41..    During their investigation, which involved the forensic processing of the Curriers'

17

vehicle that had been taken, investigators collected hairs and DNA. Accordingly, comparison of KEYES' DNA to that which has been recovered (as well as DNA that might be recovered should the Curriers' bodies be found), might result in confirming KEYES' confession.

42. On the basis of these facts and my training and experience, I believe that there is probable cause to believe that DNA samples from KEYES will provide evidence to link him to the abductions and murders of S.K., and Bill and Lorraine Currier. I consulted with AUSA Frank Russo about the proper vehicle in which to bring this request to the court. AUSA Russo advised me to apply for a search warrant as the giving of a DNA sample does not constitute a testimonial communication, and therefore does not violate Vongthongdy's Fifth and Sixth Amendment rights. United States v. Lewis, 483 F.3d 871, 873-874 (8th Cir. 2007) (collection of buccal swabs was not a critical stage of the proceeding and did not violate the defendant's Sixth Amendment right to counsel); see also, United States v. Wade, 388 U.S. 218, 227 (1967) (preparatory steps in the gathering of the Government's evidence "such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair and the like" do not violate the defendant's Sixth Amendment right to counsel).

//

//

18

## REQUEST FOR SEALING

43.    The investigation of this case is ongoing and disclosure of the issuance of the search warrant could result in destruction of evidence and could also impact officer, witness and victim safety.  Accordingly, pursuant to the case law outlined in the government's motion to seal, I respectfully request that the search warrant, search warrant affidavit, attachments, and returns be sealed.

Further your Affiant sayeth naught.

**/s/ Signature Redacted**

Special Agent Jolene Goeden

Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me

this  11  day of  April  2012.

**/s/John D. Roberts, USMJ**
**Signature Redacted**

Honorable John D. Roberts

United States Magistrate Judge

19

# **ATTACHMENT A**

Two Buccal Swabs from Israel Keyes.



4/11/2012